```
                                          ┌─────────────────────────┐
                                          │ USDC SDNY               │
                                          │ DOCUMENT                │
UNITED STATES DISTRICT COURT              │ ELECTRONICALLY FILED    │
SOUTHERN DISTRICT OF NEW YORK             │                         │
- - - - - - - - - - - - - - - - - -x      │ DOC #:                  │
                                     :    │ DATE FILED: 2/21/07     │
UNITED STATES OF AMERICA                  └─────────────────────────┘
                                     :

      - against -                             OPINION
                                     :
DAVID FINNERTY,                               05 Cr. 393 (DC)
                                     :
            Defendant.
                                     :
- - - - - - - - - - - - - - - - - -x
```

**APPEARANCES:**   MICHAEL J. GARCIA
                   United States Attorney for the Southern
                   District of New York
                        By:  Lauren Goldberg, Esq.
                             Anirudh Bansal, Esq.
                             Assistant United States Attorneys
                   One St. Andrew's Plaza
                   New York, NY  10007

                   HAFETZ & NECHELES
                        By:  Frederick P. Hafetz, Esq.
                             Tracy E. Sivitz, Esq.
                   Attorneys for Defendant
                   500 Fifth Avenue
                   New York, NY  10110

**CHIN, D.J.**

          In this case, defendant David Finnerty, a former

specialist on the New York Stock Exchange, was convicted of

securities fraud by a jury on October 26, 2006. He moves for a

judgment of acquittal under Rule 29(c) of the Federal Rules of

Criminal Procedure or, alternatively, for a new trial under Rule

33.

          The Government proved at trial that Finnerty engaged in

interpositioning: instead of matching pending buy and sell

orders, Finnerty repeatedly traded for his firm's proprietary

account, buying stock from one customer and selling it to another, making a profit from the slight differences in pricing. The issue presented is whether the Government proved that Finnerty engaged in fraudulent or deceptive conduct within the meaning of the securities laws.

I hold that the Government did not, for the evidence at trial did not establish that Finnerty's customers were misled or defrauded or otherwise deceived.  Accordingly, Finnerty's motion pursuant to Rule 29(c) is granted and the jury's verdict is set aside.  The Court will enter a judgment of acquittal.  In addition, pursuant to Rule 29(d)(1), in the event that the judgment of acquittal is later vacated or reversed, I conditionally grant defendant's motion for a new trial.

## STATEMENT OF THE CASE

## I.   The Facts

Construed in the light most favorable to the Government, see United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003), the evidence at trial showed the following:

### A.   Finnerty

Finnerty was employed by Fleet Specialist, Inc. ("Fleet"), as a New York Stock Exchange ("NYSE") specialist beginning in approximately 1996.  (Tr. 11, 1022).[1]  Between 1999

---

[1]      Citations to "Tr." and "OA Tr." are to, respectively, the transcripts of the trial and the oral argument of this motion.  Citations to "GX" and "DX" refer, respectively, to Government exhibits and defense exhibits received at trial.

and 2000, Finnerty was the specialist for Celera Genomics Group ("CRA") and PE Biosystems ("PEB").  (Id. at 1029).  From September 2000 until April 2003, Finnerty was the specialist for General Electric ("GE") -- one of the most heavily traded stocks on the NYSE -- and perhaps Fleet's most prestigious stock.  (Id. at 25, 59, 1029).  Indeed, Finnerty was so successful as a specialist that he would, on occasion, be interviewed by CNBC about the market, and was featured in newspaper articles about the NYSE.  (Id. at 462-63, 1199, 1249; DXs 700, 8000C).

   B.   **NYSE Specialists**

        Typically, purchases and sales of stocks on the NYSE are executed through a specialist who works on the floor of the exchange.  (Tr. 17).  Each stock that is traded on the NYSE is assigned to a specific specialist, and the specialist is the only person on the floor who trades the stock of a particular company. (Id.).  To buy or sell a particular stock, buyers and sellers must first present their bids or offers to the specialist assigned to that stock.  (Id. at 18).

        Purchase and sell orders are presented to a specialist in two ways.  First, the order may be conveyed orally by a floor broker on the floor of the exchange at the specialist's post. (Id. at 18, 227-28).  Second, an order may be transmitted to the specialist electronically using the NYSE's "Super Designated Order Turnaround System" (the "Super DOT").  (Id. at 18-19, 227-28).  Orders transmitted this way appear on a computer screen known as the "display book."  (Id. at 19, 228-29).

After receiving the order, a specialist can fill it in two ways.  A specialist is generally required by NYSE rules to match any open buy orders from one customer with any open sell orders from another customer.  (Id. at 1035-36).  Specialists are permitted, however, to execute trades on a "principal" or "dealer" basis when such a trade is necessary to maintain a fair and orderly market.  (Id. at 26-27, 1030, 1036-37).  For example, if there are no matching buy and sell orders in a given price range at a given time, specialists are authorized to execute a purchase or sale by selling stock from or buying stock for the specialist's proprietary account.  (Id. at 26-27, 1036-37).

Pursuant to NYSE Rule 104, specialists are under an affirmative obligation to buy or sell stock on a principal or dealer basis when necessary to maintain a "fair and orderly" market, i.e., to minimize any actual or anticipated short-term imbalance between supply and demand.  (Id. at 54).  Similarly, specialists are obliged to refrain from purchasing or selling securities on a principal or dealer basis when not necessary to maintain a fair and orderly market.  (Id. at 26-27, 1030, 1036-37).  This negative obligation generally precludes specialists from executing trades on a principal or dealer basis when there are matching public orders to buy and sell.  (Id.).  In other words, specialists are prohibited from "interpositioning" or engaging in DOT arbitrage -- i.e., trading on their own accounts between existing investor orders (thereby earning a profit on the

- 4 -

discrepancy in prices) when there are buy and sell orders that can be matched.  (Id. at 1035).

### C.  **The Clerks**

On the floor of the exchange, clerks assist the specialist by executing trades at the specialist's direction. (Id. at 219).  There are two categories of clerks: backup clerks and front line clerks.  (Id. at 20-21).  The backup clerk runs errands, gets coffee and lunch, and does administrative paperwork -- all the while learning to operate the display book.  (Id.). The front line clerk stands next to the specialist at the panel, and carries out the specialist's orders to execute trades. (Id. at 21).  A specialist is typically someone who has worked his way up from a backup clerk.  (Id. at 20).  Finnerty, for example, began as a clerk in 1986 and finally became a specialist in 1996.  (Id. at 25, 1022).

At trial, the Government called three clerks -- Philip Finale, Douglas Lange, and William Ottesen.  Finale, who clerked for Finnerty in GE for approximately six months (Tr. 217), testified that even when there were orders that could be paired off, Finnerty would sometimes direct him to trade for the principal account ahead of either the buyers or sellers, and subsequently trade for the principal account on the opposite side (id. at 295-97).  In doing so, Finnerty would sell at a higher price than he bought, and earn a profit for the principal account.  (Id.).

On his first day on the job, Finale questioned Finnerty about trading for the principal account when public orders could be matched. (<u>Id.</u> at 308). Finale knew that these trades were improper (<u>id.</u>), and that a specialist has an obligation to always place the public first (<u>id.</u> at 252). Nonetheless, Finnerty replied by telling Finale to go ahead with the trades. (<u>Id.</u> at 308-10).

In early December 2002, Finnerty learned that there would be an investigation by the NYSE into DOT arbitrage. (<u>Id.</u> at 411-12). Finnerty informed Finale about the investigation, and directed Finale to start pairing off the DOT orders -- which he promptly did. (<u>Id.</u> at 412).

In April 2003, Finnerty approached Finale on the floor of the exchange the day before Finale was to testify before the NYSE regarding the investigation. (<u>Id.</u> at 417-18). Finnerty told Finale that Finale should not "say anything to incriminate [Finnerty], because it's going to incriminate [Finale] also." (<u>Id.</u> at 418).

Lange, who clerked for Finnerty for one day while filling in for another clerk, testified that Finnerty directed him to trade for the principal account when public orders could have been matched. (<u>Id.</u> at 629, 641-42). Lange also testified that he felt "uneasy" about conducting these trades, and informed the head clerk that he hoped he would never have to clerk for Finnerty again. (<u>Id.</u> at 641-42).

Ottesen, who clerked for Finnerty approximately eight to ten days (id. at 921), also testified that he executed trades for the principal account rather than match orders at the direction of Finnerty (id. at 925-27).  Ottesen felt that these trades were improper, and he also questioned Finnerty the first time Finnerty directed him to execute these trades.  (Id. at 935).  Finnerty responded by pointing to his badge, indicating to Ottesen that these trades were permissible because he said it was.  (Id. at 935-36).

### D.   **The Exception Reports**

Dr. Roken Ahmed testified that the NYSE created exception reports that identified all the interpositioning trades in Finnerty's assigned stocks.  (Id. at 724-25).  These exception reports were generated by a computer algorithm.  (GX 2100, 2102-2104, 2109, 2111-2118).  Three types of exception reports were created: (1) customer disadvantaged, where the principal account earned a profit; (2) customer advantaged, where the principal account incurred a loss; and (3) breakeven, where the principal account neither profited nor lost.  (Tr. 729-30).

The Government submitted various summary charts relating to the number of interpositioning violations in the stocks Finnerty traded.  One of the charts showed that, in total -- from November 1999 to April 2003 -- there were 26,283 interpositioning trades in the stocks Finnerty traded where the principal account earned a profit.  (GX 1020).  The trades resulted in approximately $4.5 million in profit for Fleet's

- 7 -

principal account.  (Id.).  In contrast, during this same period, there were only 130 interpositioning trades where the principal account lost money, and only 1,340 interpositioning trades where the principal account broke even.  (Id.).  So, approximately 95% of the time where there was interpositioning in the stocks Finnerty traded, the principal account profited.  (Id.).[2]

Another chart submitted by the Government identified the number of daily customer disadvantaged interpositioning trades that occurred for GE from October 1, 2002 through April 11, 2003.  (GX 1021).  The number of daily interpositioned trades in October and November 2002 was consistently high.  (Id.).  The interpositioned trades, however, virtually disappeared starting December 5, 2002 -- the day that Fleet announced that the NYSE would be investigating "the practice of buying/selling ahead of DOT Orders by specialists" and that Fleet itself would be investigating DOT arbitrage.  (Id.; Tr. 415; GX 75).

   E.   **Screenshots**

The Government offered in evidence twenty-seven screenshots, which showed -- virtually keystroke by keystroke -- how some of the interpositioning trades were entered into the display book.  Finale reviewed the screenshots, and testified that the pattern of trading reflected the types of trades he

---

[2]   Eventually, Fleet agreed to reimburse its customers, at least in part, as it agreed, in a settlement of administrative proceedings brought by the SEC, to pay $38,013,594 in disgorgement and $21,083,875 in civil penalties.  See In re NYSE Specialists Sec. Litig., 405 F. Supp. 2d 281, 295 (S.D.N.Y. 2005).

executed for Finnerty while clerking for him in GE.  (Id. at 408-09).

F.    **Finnerty's Deposition Testimony**

Excerpts of Finnerty's testimony before the NYSE in connection with the NYSE's investigation into interpositioning were offered into evidence.  (Id. at 1021-38; GXs 9000, 9001).

Finnerty identified the stocks he traded, and explained that the amount he received as a bonus was determined, in part, by the amount of profit he earned for the principal account, i.e., Fleet's overall performance and his performance.  (Tr. 1023-24, 1027-30).  He stated that he would instruct his clerks to trade for the principal account ahead of public orders if it was necessary to maintain a fair and orderly market, but only if the public orders traded ahead of received the same or better price than the specialist received.  (Id. at 1030-32).  This, he explained, was "[b]ecause no order should be disadvantaged in price and myself as principal or our firm advantaged."  (Id. at 1033).

Finnerty also acknowledged that "as a specialist, you have a fiduciary responsibility to get the best price and a price that -- and you, as principal, cannot participate in a price that is superior for any public orders that you are acting as agent for."  (Id. at 1034).  He explained that the specialist's negative obligation requires that "when it is possible for a specialist to match up orders, it is his responsibility to do

so."  (Id. at 1036).  He was thus aware that interpositioning was a violation of NYSE rules and Fleet policy.  (Id. at 1035).

### G.   Finnerty's Compensation

Fleet's primary financial officer at the time, Joseph DiPrisco, testified regarding Finnerty's compensation.  He stated that specialists were paid a base salary and a bonus, and that the bonus was based, in part, on the profit that a specialist made for the principal account.  (Id. at 859).  During the period from 1999 to 2002, specialists typically received between 15 and 20% of their trading profits as a bonus.  (Id. at 860; GX 1051).

In 2000, Finnerty received two bonuses totaling $2 million.  (Tr. 1041; GX 1050).  The bonus for the first six months was $700,000, which represented about 2,262% of trading profits.  (Tr. 862-63, 1042; GX 1050).  The bonus for the next six months was $1.3 million, which represented about 15% of trading profits.  (Id.).  His base salary that year was $150,000.  (Tr. 860).

In 2001, Finnerty also received two bonuses totaling $2.9 million.  (Tr. 1042-43; GX 1050).  The bonus for the first six months was $1.5 million, which represented about 14% of trading profits.  (Id.).  The bonus for the next six months was $1.4 million, which represented about 12% of trading profits.  (Tr. 1043; GX 1050).

In 2002, Finnerty received two bonuses totaling $1.75 million.  (Id.).  The bonus for the first six months was $1 million, which represented about 13% of trading profits.  (Id.).

- 10 -

The bonus for the next six months was $750,000, which represented about 6% of trading profits.  (Id.).

###### H.   **The Defense Case**

On its case, the defense called one witness, Dr. Patrick Conroy.  Dr. Conroy testified that the number of interpositioning violations represented less than 1% of the total number of trades executed by Finnerty as a specialist during the relevant time period, and that the daily average volume of shares traded in GE was far greater than most stocks traded on the NYSE. (Tr. 1141, 1144-45, DXs N100, N200).

## II.  **Procedural History**

On April 11, 2005, the Government indicted Finnerty on three counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  A superseding Indictment with substantially the same allegations was filed on August 22, 2006.[3]

Specifically, the Indictment alleged that Finnerty engaged in a scheme of interpositioning that resulted in purchasing and selling securities for Fleet's proprietary account at advantageous prices, to the detriment of the investing public. (Indict. ¶¶ 11, 13-14).  The Indictment alleged that Finnerty's conduct constituted securities fraud in violation of Section 10(b) and the regulations promulgated thereunder.

---

[3]      The original Indictment alleged violations of both "trading ahead" and "interpositioning."  The superseding Indictment eliminated charges based on "trading ahead."

Finnerty filed a pre-trial motion requesting that the Court: (1) dismiss the Indictment, (2) strike certain allegations from the Indictment, and (3) allow him to inspect the grand jury instructions.  On October 2, 2006, I issued a decision granting the motion in part and denying it in part.  See United States v. Finnerty, 05 Cr. 393, 397 (DC), 2006 WL 2802042 (S.D.N.Y. Oct. 2, 2006).  First, I held that the Government's allegations of securities fraud stated a claim under Rule 10b-5(a) and (c), but not under Rule 10b-5(b).  Id. at *3-7.  Second, I denied the requests to strike certain allegations and for inspection of the grand jury instructions.  Id. at *7-9.

Trial commenced on October 12, 2006.  On October 26, 2006, the jury returned its verdict, finding Finnerty guilty on all three counts of the Indictment.  This motion followed.  Oral argument was held on January 9, 2007, at the conclusion of which I reserved decision.

## DISCUSSION

First, I discuss Finnerty's motion for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure.  I do so by discussing: (a) the standards applicable to such motions; (b) the background and purpose of Section 10(b) and Rule 10b-5, the securities laws that Finnerty has been found guilty of violating; (c) whether the Government has shown that interpositioning is a deceptive act within the meaning of the securities laws; and (d) whether the Government is able to

sustain the conviction on alternate theories.  Second, I turn to Finnerty's alternative request for a new trial under Rule 33.

**I.   <u>The Motion for Judgment of Acquittal</u>**

   **A.   <u>Standard for Judgment of Acquittal</u>**

        "A defendant challenging the sufficiency of the evidence supporting a conviction faces a 'heavy burden.'"  <u>United States v. Glenn</u>, 312 F.3d 58, 63 (2d Cir. 2002).  "A conviction must be upheld if, after viewing the evidence in the light most favorable to the Government, and drawing all reasonable inferences in its favor, '<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  <u>United States v. Medina</u>, 944 F.2d 60, 66 (2d Cir. 1991) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)).  Therefore, a jury's verdict will be affirmed "so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt."  <u>United States v. Hamilton</u>, 334 F.3d 170, 179 (2d Cir. 2003).  "Moreover, pieces of evidence must be viewed not in isolation but in conjunction."  <u>United States v. Stewart</u>, 305 F. Supp. 2d 368, 375 (S.D.N.Y. 2004) (internal citations omitted).

        "Nonetheless, a conviction based on speculation and surmise alone cannot stand."  <u>United States v. D'Amato</u>, 39 F.3d 1249, 1256 (2d Cir. 1994).  Thus, the Government "must do more than introduce evidence 'at least as consistent with innocence as with guilt.'"  <u>Id.</u> (quoting <u>United States v. Mulheren</u>, 938 F.2d 364, 372 (2d Cir. 1991)).

**B.**     **Section 10(b) and Rule 10b-5**

Section 10(b) of the Securities Exchange Act forbids (1) the "use or employ[ment] . . . [of] any . . . manipulative or deceptive device," (2) "in connection with the purchase or sale of any security," (3) "in contravention of" Securities and Exchange Commission ("SEC") "rules and regulations."  15 U.S.C. § 78j(b); see also Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341 (2005).

"The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions -- to make sure that buyers of securities get what they think they are getting. . . ." Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 (2d Cir. 1984) (Friendly, J.); see also United States v. Russo, 74 F.3d 1383, 1390 (2d Cir. 1996) (Section 10(b) seeks "to prevent fraud, whether it is 'a garden type variety of fraud, or present[s] a unique form of deception.'").

Congress's primary objective in passing the Securities Exchange Act was "to insure honest securities markets and thereby promote investor confidence." SEC v. Zandford, 535 U.S. 813, 819 (2002) (quoting United States v. O'Hagan, 521 U.S. 642, 658 (1997)).  As the Senate Report accompanying the Act explained:

> The purpose of this bill is to protect the
> investing public and honest business . . . .
> The aim is to prevent further exploitation of
> the public by the sale of unsound,
> fraudulent, and worthless securities through
> misrepresentation; to place adequate and true
> information before the investor; to protect
> honest enterprise, seeking capital by honest
> presentation, against the competition

> afforded by dishonest securities offered to
> the public through crooked promotion; to
> restore the confidence of the prospective
> investor in his ability to select sound
> securities; to bring into productive channels
> of industry and development capital which has
> grown timid to the point of hoarding; and to
> aid in providing employment and restoring
> buying and consuming power.

S. Rep. No. 47, 73d Cong., 1st Sess., at 1 (1933).

Thus, the very core of the federal securities laws in question is the premise that there must be some form of deception.  If consumers are getting "exactly what they expect[]," then the conduct is neither deceptive nor fraudulent -- and therefore not within the ambit of § 10(b) and Rule 10b-5. Chemical Bank, 726 F.2d at 943; see also Chiarella v. United States, 445 U.S. 222, 234-35 (1980) ("Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud.").  To convict under Rule 10b-5(a) and (c) then, the Government must prove that a defendant committed a deceptive act. (Tr. 1361-62).  See also 17 C.F.R. § 240.10b-5(a), (c).[4]

_____

[4]    Indeed, Finnerty was charged with using and employing "manipulative and deceptive devices and contrivances" by "employing devices, schemes and artifices to defraud . . . [and] engaging in acts, practices and courses of business which operated and would and did operate as a fraud and deceit upon persons."  (Indict. ¶ 20).  Likewise, the jury was instructed that to convict Finnerty it had to find deception, which was defined as follows:

> The law prohibits all kinds of deceptive
> acts.  A deceptive act is one that tends to
> deceive or has the power to mislead.  To
> deceive means to cause to accept what is
> false, especially by craft or trickery or to
> deprive especially by fraud or stealth. . . .

(Tr. 1362).

- 15 -

C.   **Was the Interpositioning Deceptive?**

Here, Finnerty argues that the Government failed to prove deception in violation of the federal securities laws because the Government did not prove that customers were deceived by his actions.  Finnerty argues that the Government presented no evidence of what customers expected or what they knew or were told when they were allegedly deceived.  Without proof of customer expectations, Finnerty contends, the Government was unable to show that his interpositioning deceived customers. (Def. Mem. at 1, 3-6; Def. Reply Mem. at 2-4).

I therefore address first whether proof of customer expectations was required and second, if so, whether sufficient proof of customer expectations was adduced at trial to demonstrate that the interpositioning here was deceptive within the meaning of the securities laws.

1.   **Proof of Customer Expectations**

The Government argues that proof of customer expectations was not required.  I disagree, at least in the context of this case.

First, in its opening statement the Government explicitly referred to customer expectations:

> When public customers place orders on the stock exchange to buy or sell shares of stock, they <u>expect</u> that the specialist who is responsible for trading the stock will try to get them the best possible fair price under the circumstances, and they rely on the specialist to execute their trades in a fair and proper manner.

- 16 -

(Tr. 13) (emphasis added); see also id. ("David Finnerty did not
honor the trust that buyers and sellers place in the specialist
who trades stocks on the floor of the exchange.  Instead he
abused that trust.").  In summation, the Government argued again
that "buyers and sellers" had "the right to expect that when they
sent an order to David Finnerty, David Finnerty would fulfill his
duty as a specialist, his duty to get them the best price."  (Tr.
1251) (emphasis added).  Thus, the Government recognized that
proof of customer expectations was required to prove deception,
and it asserted explicitly that customers expected the specialist
to try to get them the best possible fair price.  It asserted
explicitly that customers placed their trust in the specialists.
The Government was required to prove these assertions.

Second, although apparently no case has specifically
addressed the issue of whether proof of customer expectations is
required,[5] logic and the available case law suggest the answer is
yes.  As this Court has held, "whether conduct may 'fairly be
viewed as deceptive' will generally depend upon the circumstances
of the particular person or class allegedly deceived, their
knowledge and perceptive faculties.  In other words, before the
court can ask 'Was the conduct deceptive?', it must first
ascertain 'To whom?'"  Klamberg v. Roth, 473 F. Supp. 544, 550
(S.D.N.Y. 1979).  It makes sense, then, that in securities fraud

---

[5]     Although the Government argues that Finnerty has cited
no authority for the proposition that proof of customer
expectations is required in a securities fraud case, the
Government likewise has failed to cite any authority for the
proposition that such proof is not required.

- 17 -

cases the Government generally is required to provide proof of customer expectations, _i.e._, proof of what customers "think they are getting"; otherwise, a juror has no way of concluding whether customers were deceived by a defendant's conduct.[6]

Significantly, Finnerty is not arguing that evidence of customer expectations is an element of the crime that the Government must establish for a conviction under 10b-5.  Rather, Finnerty is arguing that, under the facts of this case, the Government could not prove that interpositioning was deceptive without showing what the investing public expected.  I agree.

The Government notes that in my decision on the pre-trial motions, I held that if the allegations of interpositioning were proven they "would indeed be violations of subsections (a) and (c) [of Rule 10b-5]."  _Finnerty_, 2006 WL 2802042, at *4.  Those words, however, did not relieve the Government from having to prove at trial that interpositioning was deceptive -- that

---

[6]    It is true that in _O'Hagan_, the Court wrote that § 10(b)'s language "requires deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller."  521 U.S. at 658.  One might argue that in this case, no proof of customer expectations is required because one need not show that a purchaser or seller has been deceived.  This argument, however, misconstrues _O'Hagan_.  Although no purchaser or seller may have been deceived in that case -- which involved the misappropriation theory -- there was nevertheless deception.  There, the defendant owed a fiduciary duty to a company, who entrusted defendant with confidential information.  By using that information illegally to trade in securities for personal profit, the defendant deceived the company to whom he owed a fiduciary duty.  Thus, there was still deception.  Here, however, the only way to discern whether interpositioning was a deceptive act is to look to the customers.  No one else is alleged to have been deceived by Finnerty's conduct.  Moreover, as discussed below, the Government did not prove that Finnerty owed a fiduciary duty to his customers.

customers got something different from what they expected.
Indeed, in my decision, taking the allegations of the Indictment
to be true, I held that:

> this scheme or course of business worked to
> deceive the trading public, as investors
> <u>believed</u> that [Finnerty and other
> specialists] were working to match orders,
> first and foremost, and that [the
> specialists] traded for their own proprietary
> accounts only to maintain a fair and orderly
> market.

<u>Id.</u> at *4 (emphasis added).

Similarly, in his decision denying a similar motion to
dismiss an indictment in a case involving other specialists,
Judge Stein assumed the Government would prove customer
expectations:

> Put simply, defendants' customers were led to
> <u>believe</u> one thing when another was true --
> and this deception was integral to the
> alleged scheme to defraud because <u>had</u>
> <u>defendants' customers known the truth</u>, they
> may have shaped their orders differently
> (viz., by specifying a narrower price window
> to prevent the specialist from capturing the
> spread between the offered sell price and the
> offered buy price) or not placed orders at
> all.

<u>United States v. Bongiorno</u>, No. 05 Cr. 390 (SHS), 2006 WL
1140864, at *7 (S.D.N.Y. May 1, 2006) (emphasis added).

Hence, the Government was required to prove that
customers expected one thing and got something different.
Without evidence of what the customers expected, no rational
juror could conclude that the interpositioning trades had a
tendency to deceive or the power to mislead.  A juror would only
be able to reach that conclusion by speculating -- impermissibly

- 19 -

-- as to what customers expected.  See United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972) (Friendly, J.) ("The jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy.") (quoting Curley v. United States, 160 F.2d 229, 232 (D.C. Cir. 1947)).

To be clear, the Government is not required to call public customers as witnesses to prove their actual expectations. The Government can rely on other evidence, such as documents or other witnesses, to show what customers expected or believed when they dealt with specialists.[7]  I hold merely that, in the circumstances of this case, proof of customer expectations was

---

[7]    For example, in the civil suits brought by customers against the NYSE and various specialist firms, including Fleet, the plaintiffs relied on statements made by the specialist firms in newspaper articles, press releases, SEC filings, and promotional materials (such as websites).  For example, Fleet is alleged to have made the following statements to customers:

> The specialist can't just throw his hands into the air and say, "I'm going to lose money if I make this trade -- I'm going to just walk away."  He is obliged to participate even when he knows the average investor wouldn't do so.  His first responsibility is to the market and his second responsibility is to his own portfolio.
>
> . . .
>
> As reinforced by stringent NYSE regulations, the specialist may only step in to buy or sell when it is necessary to do so.  That is, if there is a natural match between buyer and seller, the specialist stays out of the trade unless there is the opportunity to improve the price for either the buyer or the seller.

In re NYSE Specialists Sec. Litig., 405 F. Supp. 2d at 331.

required to show that the customers were deceived.

##     2.    The Government's Evidence of Customer Expectations

        The Government argues that even if evidence of customer
expectations was required at trial, the conviction should
nevertheless be upheld because it presented ample evidence of
what customers expected.  (Gov't Mem. at 16-17).  The Government
makes this assertion even though at trial it did not call any
customer -- buyer or seller -- or any other witness to testify as
to what customers expected.

        The Government argues that it presented evidence of
customer expectations in two respects.  First, it offered
Finnerty's testimony, given at his deposition, that he had an
obligation as a specialist to match customer orders and not to
disadvantage a customer order for the benefit of the principal
account.  (Tr. 1033-34, 1036).  Second, it offered the NYSE
rules, which require a specialist to match public orders whenever
possible.  (Tr. 587-88).  In essence, the Government argues that
customers were effectively "on notice" that specialists had an
obligation to match orders, and that this constitutes evidence of
what customers expected.  Indeed, at oral argument, the
Government pressed the point by stating:

> To suggest that Mr. Finnerty can say, I know
> that I have to match up orders, it's my
> responsibility to do so, the rule says the
> same thing, to suggest that that isn't
> evidence of what the customers expected -- do
> you think they expect him not to fulfill his
> responsibility that he knew he had?

(OA Tr. 21-22).

It is of course the case that no customer would expect a specialist to violate his own obligations or responsibilities. Nonetheless, at least two questions are presented by the argument: first, whether a violation of one's internal rules is enough to show that conduct is deceptive, and, second, whether the customer was aware of the specialist's obligations.

As to the first question, there is authority that a violation of NYSE rules, without more, is not enough to constitute a deceptive or fraudulent act.  Evidence that the conduct is deceptive is still required.  See Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971); Van Alen v. Dominick & Dominick, Inc., 441 F. Supp. 389, 404 (S.D.N.Y. 1976) ("Since plaintiff has not proven fraud, her claim based upon the [violation of] NYSE rules is as deficient as if no fraud had been pleaded in the first place.").  Moreover, just because Finnerty knew what his obligations were does not mean that customers were aware of those obligations.

Second, even assuming Finnerty violated NYSE rules against interpositioning, the Government still had to demonstrate that the customers were deceived -- that they were aware of the rules, expected the specialists to comply with them, and acted in accordance with those expectations.  The record simply does not contain evidence to this effect.[8]  As a consequence, the jury was

---

[8]     The only evidence of customer expectations offered at trial was Dr. Ahmed's testimony that customers did not expect the best price, but rather, expected fast execution.  (Tr. 781-83).

required to assume, for example, that the customers knew about these rules[9] and expected the specialists to comply with them.

Nor was the jury presented with any evidence to show that customers expected specialists to get them "the best possible fair price" or that customers placed their "trust" in him, as the Government argued in its opening statement. (Tr. 13). Indeed, the Government presented no evidence to answer the following questions: What, if any, understanding did customers have as to a specialist's obligations? What did customers expect when presenting an order to the specialist? What did customers "trust" the specialists to do? Did customers even know that a specialist could trade for his proprietary account? Did customers assume that the specialist was providing services

---

[9]     The Government does not argue that the Court can take judicial notice that customers were aware of the existence of these rules, for good reason. Under Rule 201 of the Federal Rules of Evidence, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Whether defendant's customers knew about the existence of the NYSE rules concerning a specialist's affirmative and negative obligations is a matter of reasonable dispute.

If the investing public was not aware of these rules, then the Government is left with arguing that customers were deceived not by the actual conduct of interpositioning but rather by the fact they did not know that Finnerty was violating these rules. But Finnerty is being prosecuted not for his failure to disclose that he was violating the rules but for making the trades. Indeed, I previously held that the Government could not prosecute Finnerty under Rule 10b-5(b) for failing to disclose that he was interpositioning because the Government did not identify any misleading statements, or any statements that were made misleading by defendant's omissions. Finnerty, 2006 WL 2802042, at *5-7.

without charge?  Or did customers know that the specialist was
trading for his own account and making a profit?  Did customers
believe that they would get the best possible price and, if so,
what was the basis for that belief?  Would customers have thought
they had been deceived upon learning that in some trades, where
they bought or sold within their limits or at market price, the
specialist made a profit of a few cents a share for the
proprietary account?

Some of the answers to these questions may be obvious
to those with knowledge of the industry, but none of these
questions were answered by the evidence presented at trial.  A
rational juror with these questions could not reasonably have
concluded, without speculating as to customer expectations and
beliefs, that interpositioning was deceptive.  The Government's
assertion that Finnerty's knowing violation of NYSE rules is
proof of customer expectations is therefore rejected.

The Government has thus failed to show that
interpositioning constituted a deceptive act within the meaning
of the federal securities laws because it did not provide proof
of customer expectations.

D.   **Alternate Theories**

Because the Government has not provided sufficient
evidence of customer expectations, I discuss whether it can
sustain its conviction on other theories.  Accordingly, I address
the argument that defendant is guilty under 10b-5(a) and (c) for
manipulating stock prices.  I also address whether evidence of

- 24 -

theft was enough to constitute fraud within the meaning of the securities laws.  Finally, I discuss the Government's repeated reliance on the fact that Finnerty profited, both personally and for his firm, from interpositioning.

### 1.   **Manipulation**

Section 10(b) prohibits the "use or employ[ment] . . . [of] any . . . manipulative or deceptive device."  15 U.S.C. § 78j(b).  Thus, the Government could arguably sustain the conviction on the ground that even if interpositioning was not deceptive, it was still manipulative, and therefore prohibited by Section 10(b) and Rule 10b-5.  (OA Tr. 20, 38).

The term "manipulative," however, cannot be isolated from the context of the statute.  In the securities context, manipulation still requires misleading or deceiving someone, Indeed, according to Black's Law, "manipulation" means a "[s]eries of transactions involving the buying or selling of a security for the purpose of creating a false or misleading appearance of active trading or to raise or depress the price to induce the purchase or sale by others."  Black's Law Dictionary 963 (6th ed. 1990).  The case law supports this reading of "manipulative" as well.  "Manipulation," as used in the securities context, is a "term of art" that "refers generally to practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185,

199 (1976)); see also Field v. Trump, 850 F.2d 938, 946-47 (2d Cir. 1988).

Thus, even if the Government were attempting to sustain its conviction on the manipulation prong of Section 10(b) alone, it would still be required to show that interpositioning misled customers or had the capability of misleading customers.  Without proof of customer expectations, however, the Government cannot prevail under this theory either.

In addition, the Government asserts a slightly different argument in its brief involving manipulation.  The Government essentially argues that because Finnerty interpositioned, he therefore manipulated the prices of the stock so that the principal account could earn an unlawful profit. (Gov't Mem. at 13-14).  In doing so, the Government suggests, he defrauded the public customers by holding out to them that the markets were operating fairly and honestly.  (Id.).  The Government cites to Charles Hughes & Co. v. SEC, 139 F.2d 434, 436 (2d Cir. 1943), for this proposition.  In Charles Hughes, the court held that a broker's practice of charging customers undisclosed excessive markups on securities "operated as a fraud and deceit upon the purchasers."  Id.

This argument is rejected.  I previously rejected it in my decision on the pre-trial motions, and reject this implied misrepresentation theory here as well.  See Finnerty, 2006 WL 2802042, at *6-7.  Unlike the broker in Charles Hughes, Finnerty did not "actively solicit customers," and thus, did not hold

- 26 -

himself out as someone representing the best interests of the
customers.  At a minimum, the Government did not offer proof that
Finnerty held himself out in this manner.  The fact that Finnerty
may have "manipulated" prices says nothing about whether
interpositioning misled or deceived customers.

### 2.    __Theft__

Although the Government has not explicitly argued that
interpositioning is a form of theft that constitutes fraud within
the meaning of the securities laws, the Government repeatedly
asserted at trial that Finnerty was a thief who stole money from
public customers.  (Tr. 32, 33, 34-35, 41-42, 1251, 1255, 1256,
1257-58, 1263, 1265, 1278, 1341-42).  As the Supreme Court has
made clear, however, theft by itself does not constitute
securities fraud because of the requirement of deception.
See Zandford, 535 U.S. at 825 n.4.  Indeed, theft constitutes
securities fraud only when it is accompanied by a violation of a
fiduciary duty.  Id.  In Zandford, the Court held that a
securities broker's misappropriation of a customer's assets
constituted securities fraud only because the broker also owed a
fiduciary duty to the client.  Id. at 820-21 (finding that
misappropriation scheme was materially different from simple
theft, and that it was deceptive "because it was neither
authorized by, nor disclosed to" the customer to whom he owed a
fiduciary duty); cf. Advanced Power Sys., Inc. v. Hi-Tech Sys.,
Inc., Civ. No. 90-7952, 1992 WL 97826, at *6 (E.D. Pa. April 30,
1992) (holding that in context of RICO, act of burglary is not

fraud, and requiring "the abuse of a confidential relationship"
before ordinary theft could be converted into fraud).

   Thus, even assuming that the Government demonstrated
that Finnerty was a thief who stole from public customers, his
conviction for securities fraud cannot be sustained absent a
showing that he also violated a fiduciary duty.  Because the
Government never demonstrated that defendant owed a fiduciary
duty to the public customers, the mere demonstration of theft is
insufficient to uphold the securities fraud conviction.

   Indeed, the issue of whether Finnerty owed a fiduciary
duty to the public customers was never resolved.  First, this
question was never submitted to the jury, nor did I decide this
issue in my decision on the pre-trial motions.  Finnerty, 2006 WL
2802042, at *5-6.  Second, although the Government continues to
assert that Finnerty owes such a duty (OA Tr. 21), the only
evidence it presented in this respect was Finnerty's deposition
testimony that he owed such a duty to the customers (Tr. 1034).
A fiduciary duty does not arise out of mere admission, where, as
here, the case law points to the contrary.  Indeed, the only case
to have squarely addressed this issue held that specialists do
not owe a fiduciary duty to their public customers.  See United
States v. Hunt, No. 05 Cr. 395 (DAB), 2006 WL 2613754, at *6
(S.D.N.Y. Sept. 6, 2006).  In Hunt, Judge Batts held that
"[w]hile specialists may have an obligation to maintain the
market economy, they do not owe the public a fiduciary duty, and
therefore an alleged breach of fiduciary duty cannot serve as a

basis for security fraud." Id.  Judge Batts explained that specialists serve two masters, both the buyer and the seller, and thus "have no loyalty to buyers or sellers, as they execute orders for both."  Id.[10]

In any event, in the circumstances here, the issue of the existence of a fiduciary duty was one for the jury, but the jury was never asked to decide the issue.  See United States v. Reed, 601 F. Supp. 685, 705 (S.D.N.Y. 1985) (the existence of a fiduciary relationship "invariably requires a series of factual findings and generally rests with the finder of fact, i.e., the jury, at trial"), rev'd on other grounds, 773 F.2d 477 (2d Cir. 1985); see also SEC v. Singer, 786 F. Supp. 1158, 1170 (S.D.N.Y. 1992); Langford v. Roman Catholic Diocese of Brooklyn, 677 N.Y.S.2d 436, 439 n.13 (N.Y. Sup. Ct. 1998) ("The existence of a fiduciary relationship is a question of fact for the jury.").  In short, Finnerty's securities fraud conviction cannot be sustained based on the concept of theft alone.

### 3.   **Finnerty's Profits**

Finally, the Government repeatedly referred at trial to the profits Finnerty made by interpositioning, suggesting in

---

[10]     One other case that addresses the issue of whether specialists owe a fiduciary duty is Market St. Ltd. Partners v. Englander Capital Corp., No. 92 CIV. 7434 (LMM), 1993 WL 212817, at *9 (S.D.N.Y. June 14, 1993).  First, Market St. is not directly on point, whereas Hunt is a case that shares nearly identical facts to this case.  Second, Judge Batts distinguishes Market St. by noting that unlike the broker context, public customers do not compensate specialists, and thus, no fiduciary duty is owed to the public customers under that theory.  2006 WL 2613754, at *6.  I agree with Judge Batts's analysis.

essence that interpositioning was deceptive because the trades were made without any legitimate purpose other than to make money for the specialist firm.  (OA Tr. 21).  Indeed, the Government repeatedly noted that Finnerty earned a profit for the principal account nearly 95% of the time that he interpositioned.  (Gov't Mem. at 14; GXs 1020, 1021).

Although evidence that Finnerty made a profit 95% of the time is some evidence of an intent to take advantage of his position, see United States v. Quattrone, 441 F.3d 153, 187 (2d Cir. 2006) (holding district court did not abuse its discretion in allowing evidence of defendant's wealth as evidence of motive), the evidence goes only so far.  The record is not clear, but it appears that the specialist firms do not charge a commission or fee for their service in matching trades,[11] and thus apparently the only way they earn income from the trading is when they trade for their proprietary account.  Although, again, it is not in the record, historically specialists have made a profit in the overwhelming majority of their proprietary trades. See V Louis Loss & Joel Seligman, Securities Regulation 2535 (3d ed. 2001) ("A 1966 study estimated that dealing by specialists for their own accounts was profitable over 80 percent of the time.").  Hence, evidence that Finnerty was good at what he did and was well compensated for his efforts was hardly compelling evidence that he engaged in securities fraud.

---

[11]    The Indictment alleges that "[s]pecialists generally received no compensation for executing trades on an agency basis."  (Indict. ¶ 4).

Moreover, even assuming Finnerty's profit-making shows an intent to defraud, the Government was still required to prove that customers were deceived.  As discussed above, the Government did not do so.  Evidence of Finnerty's profits was not a substitute for evidence of deception.

Accordingly, Finnerty's Rule 29(c) motion is granted. The Government failed to prove that interpositioning was a deceptive act because it did not provide proof of customer expectations.  Likewise the conviction cannot be sustained based on a theory of manipulation or theft alone or based on Finnerty's profit-making.  I do not reach the second prong of Finnerty's Rule 29(c) motion, whether the Government proved intent to deceive and the absence of good faith.

## II.   **The Motion for a New Trial**

Rule 29(d)(1) provides that:

> If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.  The court must specify the reasons for that determination.

Fed. R. Crim. P. 29(d)(1).

Because I am granting the motion for a judgment of acquittal under Rule 29(c), I must now determine whether to grant a motion for a new trial conditionally, in the event the judgment of acquittal is later vacated or reversed.  Accordingly, I first discuss the standard for a new trial, and I then address the reasons for conditionally granting a new trial here.

### A.    Standard for a New Trial

Pursuant to Rule 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  A new trial is to be granted only "in the most extraordinary circumstances."  United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993).  The defendant bears the burden of proving that this extraordinary remedy should be granted.  See United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995).

Nonetheless, a trial court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  See United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)).  In deciding whether to grant a motion for a new trial, "the judge is not required to view the evidence in the light most favorable to the prosecution."  United States v. Coriaty, No. 99 Cr. 1251, 2001 WL 1910843, at *2 (S.D.N.Y. July 16, 2001).  In addition, "the court is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'"  United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005) (internal citations omitted).  At the same time, "the court may not wholly usurp the jury's role.  It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."  Id. (internal citations and quotations omitted).

The overriding concern on a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." Ferguson, 246 F.3d at 134.  And generally, a court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29."  Id.

**B.   Conditional Grant of a New Trial**

I hold that if the judgment of acquittal is later vacated or reversed, a new trial will be granted.

First, I am concerned about the legal issues raised above as to proof of deception.  Even if I am wrong in my decision to grant a judgment of acquittal, the issues are thorny ones and the interests of justice would best be served by reconsidering the issues in the context of a new trial.  I continue to have questions as to the process by which specialists dealt with customers, what customers expected, how specialists were compensated, and how the specialist firms earned income. Even assuming the judgment of acquittal is reversed, the answers to these questions could be relevant to the issue of good faith and whether Finnerty acted with the requisite criminal intent.

Second, some of my evidentiary rulings should be revisited.  Specifically, the Government's repeated reference to the 26,300 instances of interpositioning was unduly prejudicial. (See Tr. 1402-03).  Indeed, this number formed the cornerstone of the Government's argument that Finnerty engaged in securities fraud.  (Tr. 32, 33, 34-35, 41-42, 1251, 1255, 1256, 1257-58, 1265, 1341-42).

Looking at all the evidence presented, this number is clearly and significantly overstated.  I am confident that the Government did not inflate the number intentionally, but it appears that the Government failed to account for numerous circumstances when Finnerty was not executing the trades himself -- he was not on the floor or he was not at his post or he was negotiating with the crowd or otherwise engaged in non-trading activity.  There were also exceptions that should not have been included, such as those: (1) where only a small percentage of shares were traded for the principal account in trades involving a substantial imbalance of shares; (2) where there were two or more intervening trades; and (3) where the passage of time between the first and second legs was significant.  In any event, the Government's use of the number "26,300" was severely prejudicial because the jury was left with the indelible impression that Finnerty had to be guilty if the number was that high.[12]

In addition, if it is indeed the case that Finnerty's 95% success rate in proprietary trades was not particularly unusual (in light of the historical data), I would have second thoughts as to whether this is proper evidence of guilt or whether, at a minimum, a fuller picture would provide some important context for the number.

---

[12]   In ruling on the pre-trial motions, I did not strike the number 26,300 from the Indictment because I could not assume that the Government would fail at trial to prove that Finnerty was responsible for all these instances of interpositioning. See Finnerty, 2006 WL 2802042, at *8.

Third, the Government made certain assertions in its opening and closing statements -- that customers expected the specialists to try to get them the best possible fair price and that they placed their trust in the specialists -- that were not proven.  If proof of customer expectations is not required as a matter of law and these assertions are irrelevant, the assertions should not have been made to the jury.

In its opening statement, the Government used a real estate broker analogy that, in retrospect, is inappropriate.  Its use epitomizes the flaws in the Government's approach to this case.  The Government argued:

> Let me give you a simple example of the concept behind the scheme, an example that has nothing to do with the stock exchange. Imagine a real estate broker helping buyers purchase apartments from people who want to sell, and vice versa.  There is a buyer who wants to buy an apartment, and he is willing to pay up to $200,000 for the apartment.  So the broker looks for one, and he finds one, an apartment just like the person wants to buy.

> Guess what?  It is the buyer's lucky day because the apartment is only $150,000. Well, what if it wasn't the buyer's lucky day?  What if the broker, instead of putting the buyer and seller together and letting them trade with each other at some price maybe in-between the 150 and 200?

> What if he decided to buy the apartment for himself for $150,000 and then turn around and sell it to the buyer for the full $200,000 that the buyer was willing to pay, and then he took the $50,000 difference and put it in his firm's and his pockets?

> This is a simple example of a scheme where a real estate broker cheats a buyer and seller so he and his firm can pocket extra

>            cash.  As I give you an overview of the
>            evidence in this case, keep in mind that is
>            essentially how the scheme worked here. . . .

(Tr. 12-13).

The analogy is misplaced, however, for the circumstances of a real estate broker and a specialist are substantially different.  The real estate broker works for one side, the buyer or the seller, not both, while the specialist executes orders for both sides.  The real estate broker does not act as a principal, while the specialist regularly trades for his firm's proprietary account.  The real estate broker has a fiduciary duty to the party he is representing, while the specialist does not.  The real estate broker is entitled to a commission, while the specialist earns no fee for executing public orders.  By taking an additional profit from the price differential, the real estate broker would be doing something highly improper.  The $50,000 profit (on a $200,000 transaction) that the real estate broker is pocketing is a far cry from the few cents a share that a specialist makes when trading for his firm's proprietary account.  The apartment buyer's expectations are clear: for a 6% commission, the real estate broker will act as the buyer's agent, on a fiduciary basis, solely as a broker and not as a principal.  The expectations of the specialists customers are substantially different, but they were not, in any event, established by the evidence at trial.  The use of this analogy was prejudicial.

- 36 -

For these reasons, Finnerty's alternative request for a new trial is conditionally granted, in the event the judgment of acquittal is later vacated or reversed.

## CONCLUSION

For the foregoing reasons, defendant's Rule 29 motion for judgment of acquittal is granted as to all three counts of securities fraud.  In addition, the motion for a new trial is granted in the event that the judgment of acquittal is later vacated or reversed.

SO ORDERED.

Dated:    New York, New York
          February 21, 2007

DENNY CHIN
United States District Judge